The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Ms. Abernathy, we'll be delighted to hear from you when you're ready. Thank you and good morning, Your Honor. May it please the Court, my name is Katherine Abernathy and I represent plaintiff appellant in this matter. We've asked with the panel's permission to reserve five minutes for rebuttal today. Your Honors, the appeal before the Court is following a grant of summary judgment and the overarching issue here is whether the district court was justified in taking this case away from a jury. The question before the Court is not about who should ultimately win or lose, but instead about whether there are disputed facts that necessitate trial. Unless the panel would like to take the various issues in this case in a different order, I will take them in the order set out in our brief, starting with plaintiff's claim arising under Title VII for disparate treatment. Your Honors, in this case, plaintiff has deduced facts that raise a genuine issue of material facts under well-established case law in this circuit, both on the elements of her prima facie case and in the final phase, the pretext phase of the McDonnell-Douglas pretext framework. We believe that the Court should reverse the district court's decision based primarily on two prior cases from this circuit. On the question of whether my client produced sufficient evidence to show that she was meeting tactile's legitimate expectations, we believe that that question is answered by Haynes v. Weiss connections. And on the question of whether she has deduced sufficient evidence to merit trial on the pretext question, we believe that that is answered by Miles v. Dell. First, with respect to whether she deduced evidence that she was meeting tactile's legitimate expectations, this case is very similar to Haynes, where a panel of this Court held that there was a genuine issue of material facts on this element, where first, the plaintiff received a discretionary bonus shortly before his termination, and second, plaintiff's supervisor told him that, quote, everything looks okay, and he had, quote, nothing to worry about when talking about his upcoming performance review. Likewise, in this case... Counsel, there's been... One of the things we ask in these cases is whether the employer's legitimate goals are consistent over time. And one of the things that our case law has pointed out is that shifting goals raises real questions. But the company's goals here seem to have been consistent over time. Excuse me one second. If they have prioritized a yearly growth in sales and retention of employees, so isn't that relevant here when you're talking about legitimate expectations of the company, whether the expectations remain constant over a period of time? Your Honor, the evidence that we've adduced in this case shows that they did not remain constant. In March of 2017, at the beginning of the year, Tactile sent all of its regional sales managers and area directors a document that said JA247, that said that the entire purpose of that document was to, quote, establish baseline performance standards and to motivate performance beyond base goals. That same document goes on, and in it, Tactile sets out what it says its baseline performance standards are. And it says they are to meet and exceed plans revenue targets, product shipment goals, and OC quotas established by Tactile Medical. In other words, what Tactile did was it informed its employees... Most evident metric for that being quotas? No, Your Honor, not in this case. It's almost as if my client met and exceeded her quota, but because her territory had been cut down at the beginning of 2017 by her supervisor, Tactile deemed her deficient in the area of year-over-year growth, or so Tactile claims. I would note that two years prior, her colleague, Mr. Sealing, actually posted lower year-over-year growth than she did in 2017, yet was retained and, in fact, promoted a couple years later. Tactile indicates that her quota was adjusted downward and Sterling's was adjusted upward at her request. Your Honor, that is... Of course, if you adjust the quota downward, it becomes easier to meet, and if you adjust the quota upward, it becomes more difficult. But what I'm saying is they're indicating this to quotas that these adjustments were made at her request. First of all, Your Honor, I would point out that there are differing documents that raise a factual issue. Even among Tactile's own documents about what the level of quota relief and the amount by which quotas were raised was in this particular year. For example, we have Resha's affidavit saying that Semplewich's quota growth was 22%, but there's a chart that Tactile has deduced at JA 832 in which it shows the Mid-Atlantic quota growth for 2017 at 154%, or a 54% increase over the prior year. So even Tactile's own documents are internally inconsistent about what the numbers were on the question of quota growth and quota relief. But putting that aside... Have you been testing the spreadsheets that Mr. Resh used? Absolutely, Your Honor. Mr. Resh created his Excel spreadsheets. The underlying data runs for those spreadsheets were not retained. So we don't know how he cut his data. The spreadsheets used across the company, not simply... They didn't single out Sterling and the plaintiff for the use of these spreadsheets. The spreadsheets were used for evaluations across the company, were they not? No, they were not, Your Honor. In fact, we have not seen... We got over 500,000 pages of documents in discovery. I have not seen any similar Excel year-over-year spreadsheet created by Mr. Resh, other than during the time period he was actively advocating for Semplewich's removal. That is the only time period during which such spreadsheets were created. Do we know when he created? We do. The first one was created, and I want to say it was either late September or early October of 2017. The last one that we have was created in February of 2018. So you're talking about a very discrete time period during which these spreadsheets were being generated, which, according to Resh's testimony, is also the same time period during which he was actively proposing to the other executives at Factile that Ms. Semplewich be removed from her position, that Mr. Sealing be given her territories, and that Mr. Sealing thereafter be promoted to area director. I'm sorry, was there a question? I was just going to ask you, you didn't move for summary judgment here, did you? This is not our motion that is up before you. We did cross-move for summary judgment. All I see is this is quintessentially a case where it's a very mixed record, seems to me, and I had thought that you didn't even move for summary judgment. There should be a lot of facts here. It is, Your Honor. Every which way. Yes, and our motion for summary judgment, just so we're clear, was not aimed at any of the matters before the court today. We did file a motion for summary judgment on, I believe it was two or three affirmative defenses that Tactile had raised that we believe were not supported by evidence. But it was not just that of issues. Okay. If Your Honor's... There's a question, I think. No, I was just going to ask you, I think sometime you might get to the Equal Pay Act. I know it's your last issue, but... Yes, Your Honor. We believe that the district court misconstrued a regulation that generally defines what types of remuneration can potentially qualify as wages within the meaning of the statute. And it misconstrued it as requiring the court to add together all of those different types of remuneration before you got to comparing the plaintiff and her male comparator. In so doing, we believe the district court misconstrued that regulation and did not construe it consistently with multiple other regulations also promulgated by EEOC that clarified that the district court's approach was not proper here. I would note that the plain language of the Equal Pay Act itself draws a very clear distinction between hourly pay or salary and the types of compensation that are earned through the quality or quantity of production. In this case, what the district court did was it added together my client's and Mr. Stiehling's base pay and the incentive compensation that they earned by meeting or exceeding Tactile's baseline performance standards set out in the document that I quoted to you earlier. Consistent with the statutory text, the EEOC regulations here require equal wages to be paid in the same medium of exchange and require comparison of whether males and females are paid the same wage rate. Examples of a wage rate would include the hourly amount paid to hourly employees or the base salary paid to salaried employees. What the district court did in this case is really no different than letting an employer continue to pay women a lower hourly wage so long as those women were offered the opportunity to work more hours and therefore earned more total pay. The Equal Pay Act, of course, was established to ensure equal pay for equal work. Here, Ms. Semblewedge earned more pay by overperforming against a set of performance standards that Tactile had chosen. She earned that amount through superior scalability and hard work. As the agency that promulgated the rule the court interpreted, we believe EEOC's construction of that rule and the other rules it promulgated under the EPA is entitled to substantial deference from the court. And as previously stated, it is consistent with the plain language of the statute and Tactile's brief did not raise any way in which EEOC's interpretation of its regulations was inconsistent with the plain language of the statute, which is what they would need to show where come the substantial deference that the court should give to EEOC's interpretation. Okay. No worries, Your Honor. I do want to address briefly the retaliation claim that was filed. Can we go back and address the Title VII, which is sort of foundational? I was looking in the record for evidence that these various decisions Reische's reactions to the plaintiff and how he treated her. I was looking for evidence that suggested that all of this was motivated because she was a woman or because she was age 57 or 56, whatever she was. It seems to me what comes through at best is that she maybe wanted to favor her, he wanted to favor his friend's feeling, but not that he was motivated because of There are a lot of indicators that those two factors really didn't permeate this workplace. What do you have on the evidence on that? Sure, Your Honor. Sure. Admittedly, Your Honor, this is not a direct evidence case. Brian Reische is not so foolish as to I understand, but if you have a perfectly clear... I'm sorry. I was asking if you have a perfectly clean workplace where there is no terms and conditions of employment, no harassment employment based on age or based on gender. It seems to me ultimately the burden as Supreme Court has said, ultimately the burden is on you to show intentional discrimination based on either sex or age. My review of the record looks like there was a lot of discussions about Reische's relationship with this particular employee. Maybe they didn't like each other. He did have other women regional managers. The company had five regional women managers and four males. There weren't discussions or inferences or attitudes based on that. The question is, is this case really about the battle at higher levels in corporations for positions based on personal relationships or is this motivated by gender or age? That's to me sort of fundamental in this case. I'd be happy to have you give some of the best evidence that you think shows that the motivation for moving her into this new job was based because she was a woman or because she was 57. Your Honor, I notice that my time is up on argument. May I respond? Of course you may respond. I just wanted to make sure. We have induced a lot of evidence from other women employed at Tactile that falls into a couple of categories. One is consistent exclusion of the female employees from business meetings, training opportunities, opportunities to be visible to other decision makers within Tactile. We compiled and cited much of that evidence in our brief, although at the moment I'm having trouble putting my hands on exactly where, here we go, so JA 694-95, JA 1344-45, JA 1163-65, and 88-102. That is helpful, but could you describe it because I think that that was a fair question. Sure. One is respect with women in general. There has been some sort of evidence, a lot of evidence, you say, about inequality in opportunity. Is that what you would say? Correct. There were three people that had the same title, three women that had the same title. I thought I read somewhere in the brief that they were given in the smallest areas, but can you tell us what the evidence is? Correct, Your Honor. The women employees with the exception of Jackie Gorham, who I will take as a separate issue here in a second, with the exception of Jackie Gorham, the women regional sales managers have the smallest region and were far underpaid when compared to the men on salary basis. They were also excluded from meetings in which Mr. Reich's male direct reports were included, including meetings at which business decisions were made, strategic initiatives were decided. And then the men sometimes, Reich would have Steeling and Ferkenhoff, the men that directly reported to him, then go tell their female colleagues or direct their female colleagues about how they were going to implement strategies or how they were going to do certain things. There's also testimony that women were not included in training at Tactile, particularly in opportunities to provide training to younger employees and to be viewed as leaders within the company in that respect. And in fact, Tactile's lead investigator when Tactile was investigating my client's complaint to HR, Tactile's lead investigator acknowledged that one of the reasons that she had been hired originally at Tactile was because it had issues with Brian Reich being left free to favor Steeling and Ferkenhoff in an open assignment and other counsel. You say that, but it was Mr. Reich, if he was, I thought he created the Mid-Atlantic region and I thought he made the plaintiff the manager of it. And if he did those things, how is that discriminatory when you actually put a woman in a managerial position over what seems to me a pretty important division. But the other question I have, and it's sort of related to what Judge Niemeyer was mentioning, and that is companies like this are very often into profitability. They're not into discrimination as much as, why would they want to discriminate against someone who is a successful and profitable sale manager? I mean, this raises a question in my mind because these companies, the bottom line, they're all about money. They're all about profitability. They're not into discrimination. And if someone is being successful and assisting the bottom line, that's the big deal for them. And so they have these quotas and views of retention and views of growth in sales. And all that is just related to the basic enterprise of making money, which makes everybody happy. If the company is profitable, everybody goes home happy. And if the company is not profitable, people get grumpy. So why is this discrimination rather than just trying to make some very practical decisions about the company's bottom line? Why would he make her a sales manager of an important region if he were out to discriminate against women? Your Honor, and once again, I want to be mindful that I am past my time. First of all, we disagree with the assessment that you provided of the evidence on the question of whether Reesh actually was the one who promoted my client to the regional sales manager position. In fact, what he did was he told my client that he didn't think she wanted to get into sales management. And then rather than putting her up for promotion using the promotion process at Tactile, he made her go through the external hiring process. And that is key to how women got hired at Tactile. Karen Dupree, Stephanie Tongas, and Tracy Simplewich, all female regional sales managers, all came through the external hiring process. And in that process, the candidate interviewed with six to seven Tactile employees from different departments, including Mr. Reesh, but not exclusively Mr. Reesh. And according to Mr. Reesh's testimony, those six or seven individuals then had to reach a consensus decision as to whether or not that person was hired. Whereas, normally, the promotion decision was solely in Mr. Reesh's discretion. So, Ms. Abernathy, you've got some time for rebuttal, and we very much appreciate your argument. I'm going to ask my co-counsel and my colleagues if they have any further questions of you. I just have one question coming back from what you just said. So, I do understand that Mr. Reesh could hire on his own hook and did hire the men. The men also went through that same external hiring process. However, what I would note, though, is that each of the women I just named for you were terminated by Reesh. And Reesh, by the way, had the sole termination decision. So, they were terminated by Reesh very quickly after coming through that broader hiring process. It's the termination that you object to. Correct. Well, the point being that my client was not hand-selected by Reesh for promotion to regional sales manager, which was the usual promotion process, is that Brian Reesh would just propose a slate of candidates for promotion, and the executive committee would vote it up or down. That's how she got her promotion. Reesh didn't hire her alone. She was hired by a committee. Correct. He did fire her. And he did remove her from her position. Is there any other questions? Thank you very much. And Ms. Gantz from the EEOC, who's representing the EEOC? Are you representing Ms. Gantz? I think you need to unmute, Michael. Thank you. May I please record? Can I go ahead? Hi, I'm Julie Gantz for the EEOC. Thank you so much for allowing me to be here this morning. We're participating in the case to urge this court to correct a district court total compensation approach used to disallow Sumpowich's Equal Pay Act claim. Because Sumpowich was paid a lower base salary in 2015, 16, and 17 to perform the job of regional sales manager, the same job in the same establishment as Sealing, she established a prima facie case under the Equal Pay Act. As she received more in commissions than Sealing in two of those years, which earned her a higher combined salary, in no way obviates her prima facie case, nor exonerates Tactile from its obligation to provide the same rate of pay to its male and female regional sales managers. There was no difference in their jobs. I mean, they had similar positions. That's correct, Your Honor. Let me ask you this. I'm looking at this chart on 730, and it's got the nine regional sales managers, and they're all making between $120,000 and $130,000, $135,000. And they're all making different amounts in that range. And the highest amount is actually Jackie Gorham, and she's a woman. Greg Sealing's getting $130,000. This is back in 2015. Karen Dupree's getting $130,000, same as Sealing. And the plan is getting $120,000 as are some other people. In other words, they're all within a range, but they're all different. And my question would be, is the fact that these sales managers, nine of them, are getting different incomes, all within a range, is that a violation? It looks to me like they're being compensated based on some aspect of the territory they have, the scope of the clientele and so on. Well, Your Honor, that would go to one of the affirmative defenses, but the Equal Pay Act deals with individual claims. It's not a class claim about all the women versus all the men. So as long as Sempowich is being paid a lower base rate than the male comparator, Greg Sealing, then that's the Maryland insurance case that talks about how it's an individual claim. I know that none of these people are paid exactly the same. In other words, this is not a situation where they're fixing the salary on a gross assessment of the fact that the person's called the regional sales manager. In other words, every regional sales manager gets a compensation somewhere between $120,000 and $140,000, maybe, whatever that list shows. But it shows variously men and women getting different amounts, all fairly close. And it shows, for instance, Tracy Sempowich, she started at $120,000, she went to $130,000, and then she went to $140,000. And she passed up others in that regard. Jackie Gorman started out at $135,000 and went up to $150,000. Sealing started out at $130,000, he went to $135,000, and then $142,000. In other words, these people are all making different amounts but within the same range. And the question is, you're saying, if I look at that chart, that's a violation of the Equal Pay Act? But, Your Honor, the prima facie case is to show unequal wages. No, no, answer my question. I don't want to go to the statute. I want to go to the notion that all these people who are regional sales managers are getting roughly between $120,000 and $140,000. Disparately, though. And there's obviously a basis for that, probably the size of their territory. So if one person has three states and another person has seven states, they get that rate of pay. Now, you're suggesting to me that just looking at this chart is a violation of the law. No, Your Honor, the sump of which was paid less than ceiling to do the same job under the same conditions. They had the same job. They had different sized territories. They had different performances within those territories. And they got different levels of commissions. And the question is, as the years go by, you put together these amounts, they're not far apart. I mean, we're talking about every one of these sales managers got within the same range. And you look at the commissions on that chart, they all had different amounts which probably reflects a lot of the size of their territory. But this doesn't scream as a situation where women are being paid less than men. I mean, there are women here, one woman is the best paid of all of them. That's because of the sales commissions, Your Honor. No, no. No, her base pay was $135. She was higher than anybody then. And the next year, $150. Which was the highest on the whole chart. But to make out a prima facie case, you only need to show there's one comparator, male comparator, that is making more money for the same job. And the issue in this case was that the district court... But that would go to a factor other than sex, which is not before the court right now. The issue is that the district court confused total wages with wage rate. But what I'm suggesting is that if you just look at the evidence fairly and comprehensively in some sense, it does not look like they are treating men and women differently. It looks like that men and women are different based on their gender. In other words, Tracy was making more in 2016. She's making more than a bunch of others. In 2017, she was making $140. There was only one person higher than her. That was ceiling. And he was only making $142. And the year before, Tracy, I mean Jackie Gorman, made $150. So it doesn't make sense. You're sort of carving out a statistic and saying we're going to take two statistics which are really not the same because they're not the same territories, not the same performance, not the same experience. We're directed to the Maryland insurance case. This is not a class  What's wrong with my analysis of the facts? What's wrong is that ceiling was paid $130,000 compared to her $120,000 in 2015, $135,000 compared to her $130,000 in 2015, and then still $2,000 more in 2017 to perform the exact same job under the same working conditions. Why do you say the same job? Weren't the territories different size? It's undisputed the job is the same. It's the same title. They have different responsibilities based on size of territory, right? It's undisputed the job is the same. Why is David Humiston getting only $130,000 while ceiling is getting $135,000? I have no idea, Your Honor, but that would go to a factor. You have to take that into account? In other words, you're looking for discrimination based on You think somebody who has nine states is doing the same job as somebody who has seven states? It's undisputed the job is the same. They're both regional sales managers. That is not even at issue in this appeal. Do you think all vice presidents of a company all should be paid the same?  That's not even at issue in this appeal. They're all vice presidents and they're paid enormously different range based on the scope of responsibility. We're at an executive level here. You have to look to see whether this is motivated by gender. You have to look at what the company is doing. I must say I'm very troubled by this nitpicking of a particular statistic in a broad range of statistics which look very benign from looking at them. You're saying you can pick one number where a male is getting more in one year and a female is getting less. They're all regional sales managers. It's an individual claim. It's not a class claim. You have to look at context. We're looking at discrimination in the workplace. I agree, Your Honor. In most cases under the Equal Pay Act are generally about whether the jobs are the same. In this case, it's undisputed that the regional sales manager job is the same. It's not undisputed. It is undisputed. They describe Tracy's territory and they describe Sempovich's territory. Her territories change from year to year. Everybody's territories change as the company made reassignments based on growth statistics, reorganizations, that type of thing, which was external to these two people. But the fact that they were paid differently for different sized territories I'm really surprised that the government is taking that position. But the district court found that the two jobs were the same and the only issue on this appeal is whether they were paying a higher rate to Ceiling than Sempovich. I gather your point is that you take exception to the methodology that the district court employed. You're not saying how the Equal Pay Act claim could come out or would come out as long as in your view the correct methodology is employed, which is to require the wage rate to be the same as opposed to total salary with bonuses as a component. So, you know, I don't know how it all comes out on Ringman, but I do understand what you're saying. You're just saying that if you don't look at wage rate, then if you look at just total salary, then you're in danger of penalizing a female employee who works more overtime perhaps or earns more in commissions or bonuses or whatever. So I think, you know, Judge Nemar has a really good point, but as I understand your view is you're not looking at what people are earning or even at this stage whether their job is similar. You simply want to know whether there's a differential in the wage rate. Correct. Sorry. In this case there were two rates of pay. One, the annual salary that's a time based rate for hours worked and then the commissions, which is the percentage of sales and that's a variable performance rate. Well, I don't know what the I'm not prepared at this point to say what the wage rate was or whether it was differential or not. It's just the matter as I see it of making sure the district court asked the right question. Well, the problem is lumping the two rates together because there's no... I understand that argument and I'm granting you that argument because this chart lists base salary and then it lists commissions and I was leaving off commissions because commissions are very disparate, but I was looking at base salary and everything I was talking to you was about base salary and I noticed that for the very same job Adam Perkinhall in 2016 made $144,000 while Greg Seeley made $135,000. Now, if it's the same job, they should be getting the same pay according to your position and yet they're not getting the same pay and the explanation you would give is that would, if they were different genders, that would be discriminatory but yet they give a different pay to two men for the very same job and so there must be a different factor involved and they did explain the different factor which was size of territory. That's not what the court relied on. I agree we have a problem with the district court's analysis. A lot of what my friend Judge Niemeyer is suggesting would be sorted out on remand. The problem I have is that there may have been an incorrect standard applied under the Equal Pay Act which is just fundamentally to treat men and women equally you have to give them the same wage rate for the same job and that's the question the district court has to ask and maybe the company can come forward with something and say but at any rate, I don't know if we can resolve it up here but if it's okay with you all, I would like to thank Ms. Gants for her presentation. We appreciate having you. Thank you. I'd like to hear from Ms. Parker unless either of my colleagues has further questions. Let's hear from Ms. Parker. Let's hear your side of it, Ms. Parker. Thank you, Your Honor. Good morning. My name is Kristen Parker and I'm here on behalf of Tactile Systems Technology. It's tactile's position that the district court correctly entered summary judgment in its favor on all matters. I had planned to turn to the discrimination claims first but given the current discussion about the EPA claims, I briefly would like to address that and then return to my intended argument. Judge Wilkinson, you had just raised the question of whether the Court of Appeals could affirm or address this EPA claim on another basis that the district court did not. I would contend that the Court of Appeals absolutely, even if the Court of Appeals determined that the district court applied an incorrect test when it aggregated forms of wages. There were two kinds of aggregation that I think were challenged, both wages and incentive pay, and it's not a straight commission. So it is different than the case in Kaziah. I'm just wondering if some of this should be sorted out. I'll tell you what concerns me here is that women would be unduly penalized simply for being more successful at the job and for getting more and there would be a differential in the wage rate and yet the woman would be totally compensated at a higher figure, but that may be due to her efforts. It may be due to her initiative that it was on her success was what led to her higher salary, but I'm not sure that the company wouldn't prevail on this, but all I'm saying to you is I think it's very important that women not be docked and disadvantaged because they had earned more information or had shown more initiative, and I think the increase in the wage rate helps to protect against that, and that's a big deal for me because I think people ought to be rewarded in accordance with their talents and efforts, and if there's a differential in wage rate, that's fundamental, but I don't know what the objection is to having the district court look into it further. So I agree, Your Honor, and if this court determined that the decision at the prima facie case, the court of appeals certainly could remand. The court of appeals could also, though, there is an adequate basis in the record for the court of appeals to affirm on alternate grounds, which is the affirmative defense of other factors. You put the affirmative defense before the district court didn't reach it. The only thing we have here, do you concede that the rationale the district court gave was erroneous under establishing a prima facie case under the Equal Pay Act? I don't see how you can not concede that. So I think that there is a potential issue if in all cases each various form of compensation has to be disaggregated and any minor difference in a form of compensation, in this case it's a very small percentage difference, where you have both men and women making more and men and women making less. No, I understand that, and I thought Judge Neumar did a really excellent job on that, but that goes to the affirmative defense. That doesn't go to the base and the base was different here. I just don't understand why you don't concede. Yes, that is an improper, that would violate the prima facie case under the Equal Pay Act. Sure, that is, I concede that they are different. I think the part that I... That's not what I asked you to concede. They've made out a prima facie case. Maybe you have an affirmative defense, right? Yes, Your Honor, so she did make less than another man, but there are men who would then also make out a prima facie case. Okay, so do you or do you not concede that she made out a prima facie case? Your Honor, I concede that there is a difference. You've read the Equal Pay Act, right? And you've heard the questions from the panel. Yes. So you don't concede it or you do concede it? I concede there's a difference. No, that's a question. You don't need to say yes, you don't need to say no, but you have to say one or the other. Was... Did she make out a violation, a prima facie violation or affirmative defense? Did she make out a prima facie violation of the Equal Pay Act? Your Honor, I... I think it's... I don't... I struggle with that question myself. I think it's a hard question for the panel. I'm sorry? You're refusing to answer the question. You know, coming into this, I didn't think that Fourth Circuit case necessarily held that one difference in one type of pay would do that. I hear you, Your Honor, saying that that is your... No, I'm saying what I'm trying to do is to figure out what the law is here, whether you're challenging the prima facie case or whether you're saying, no, we have an affirmative defense. That's all I want you to tell me. Sure. You know, I think there are stronger cases on the affirmative defense. I would be willing to concede that there is a difference in pay. And coming in, I did not... When you say difference in pay, do you mean difference in wage rate? Yes, a difference in wage rate in that isolated instance, yes. And so if the court holds that that is the only thing that is required to establish a prima facie case, then I concede that she's made a prima facie case. Well, let me take the question further rather than having us conclude, the question is, what is your position under the Act? Does that state a prima facie case? The differential. So the regulation that the EEOC... No, the question is, does it state a prima facie case? And if you don't have an opinion on that, it'd be very strange,  So the reason that I find this question challenging is that wages include all forms of compensation. Look, let me ask you a question. You just conceded there was a differential in wage rate. Now my question to you is a straightforward one. Under the law, does that state a prima facie case as you understand the law? Your Honor, I... The government says it does, and your inability to reject that, it seems to me the government position should prevail on that. That's really what you're leaving us, in terms of argument. I will concede the prima facie case. I think there's potential illogic to the idea that any difference, no matter how small, is a prima facie case. But it's hard to say under the words of the Act that that's not true if this Court accepts the conclusion that all forms of compensation must be... Alright, if you concede, as you have, that this is a prima facie case, then the next step is to have you provide a justification, right? As an affirmative thing. Yes, Your Honor. And the district court didn't get there, right? That is true. The district court may get there. I understand you'd like us to assess the affirmative defenses, and maybe there's a situation we can do it. But it's also... We can let the district court look into it. That's all we're saying. A lot of this is one of the problems with this case is we have this massive record. This is thrown around and this is thrown around, but this is something that a district court ought to look into with the proper methodology. And I think the EEOC has an important point to make that the methodology has to be correct or it's going to lead to all kinds of problems and inequities that seem to me contrary to what the Equal Pay Act is trying to do. Why don't you get on to the other claims, or we'd be pleased to hear from you on those. Yes, I would like to do that. So let's move to the discrimination claims, because the Equal Pay Act claims can certainly be separated from the rest of this case. With respect to the discrimination claims, I know you've mentioned the record is lengthy. I think it will come as a relief to Your Honor that I believe there are just a handful of key undisputed facts that the district court correctly found which can dispose of Ms. Semplewitch's discrimination claims. So briefly, and then I'll discuss them in more detail. First, during Ms. Semplewitch's employment, especially during 2017, Cattail asked Ms. Semplewitch to meet several specific performance goals related to year-over-year growth, related to retention, and related to employee development. Ms. Semplewitch, second, this is the most critical piece. Ms. Semplewitch admitted that she failed to meet those performance goals in 2017, at least on three occasions. Third, Cattail consistently explained there's reasons for removing Ms. Semplewitch from the RSM position. And before getting into those facts further, I want to acknowledge that on other points and at other times, Ms. Semplewitch received positive performance feedback. That's not unexpected. You've got an employee here who was promoted on multiple occasions. That Semplewitch may have performed well on some goals does not create a material dispute that she did not meet certain other performance goals that Cattail established. And finally, even if Cattail removed her from the regional sales manager position, it offered her another position that it felt played better to her strengths. So it's not unlikely that they would find that she had some strengths. I hear you on that. But my problem is that Cattail gave her these awards. Okay, her employment ends in March 2018. It wasn't four years before. In January 2018, they gave her the Regional Sales Manager Leadership and Sustained Excellence Award and $10,000 salary raise in February 2018. So it just seems like in a month she was done so poorly that she was transferred to a less lucrative position. That seems at least to raise a question of fact. Your Honor, I hear the tension. I don't think it raises a question of fact as to whether she performed on the specific goals that were relevant to her position as a Regional Sales Manager managing a group of individuals. So your Honor, when you review the record, the sales awards very clearly lay out the criteria. They were a mechanical application of sales metrics, of sales and revenue versus targets. And those targets, as your Honor will recall, were reduced repeatedly across 2017 based on the failure to fill headcount. So that quota was reduced to reduce the revenue target and then Semplewich overachieved to those reduced targets. I think that that's why this record is so muddy. Maybe so. But is this summary judgment? I think it is. And here's why. It is because it is reasonable for tactile to say for a Regional Sales Manager what that Regional Sales Manager needs to be able to do is to retain, grow, and develop a group of sales individuals. But it's a matter of whether to fire her or demote her a month after you've given her this award, a salary raise, and these things. Yes. Because they are based on performance to that adjusted quota. They are a mechanical application. And that's your explanation. And, you know, good for you. That's why there's an issue of fact. So I don't think there's an issue of fact as to the other performance standards they held her to, though. No, because they say what it is. Of course she can't make an issue of fact with respect to that. All she can do is point to this and say, no, that wasn't the real reason. You know, you don't expect them to fall on their swords and say, well, no, and create their own issue of fact, do you? I don't. But what I think is really compelling is that Tracy Semplewitch herself admitted those failures repeatedly. If you look at the appendix at 807, there's a big She has various reasons for them, doesn't she? She does. She has an explanation for not getting the support, getting the lower, the smaller territory, and maybe that's all wrong. But that's why this record is so much money. Ms. Parker, Ms. Parker, I gather you would say that the award that my friend mentioned, that's not evidence of discrimination. No. To the extent that women are awarded things, it's evidence of appreciation, not discrimination. So that's a fact that, you know, it seems to me could well cut in your favor and you don't want to discourage companies from giving women awards and they don't want lawyers sitting in there, well, watch out if you bestow these awards, you're opening yourself up to a discrimination suit. I'm nervous about having that cut against the company because I want to see female employees recognized and I don't want to see the law building a disincentive to giving them awards for whatever the award is offered for. And I wasn't suggesting to the contrary. What I was trying to do, and perhaps was inarticulate about it, was to suggest that this supports her claim or at least raises a question of whether the company legitimately believes she's performing poorly after they just have given her these awards. Again, Your Honor, I would say the fact that the awards were based on a reduced quota, that was reduced at her request, that was reduced because she couldn't grow the headcount, can show both that the company treated her very fairly as a regional sales manager and continued to make her eligible for that award, and also that the company had legitimate criticisms of her ability to retain and fill that headcount. And a fact finder might find that. There's another point here, Ms. Parker, that I wanted to bring out. When the plaintiff did fail to meet the goals with respect to growth and sales and the rest, the record seems to indicate that the company actually extended coaching to her and they wanted her to meet the goals and they extended coaching opportunities and said, look, here's how you can go ahead and meet this goal. So doesn't the coaching go to the fact, number one, that she was failing to meet the goals, and number two, that the company wanted her to meet the goals and was prepared to extend coaching opportunities to make sure that she met the goals. In other words, it goes back to what my friend Judge Niemeyer said earlier. There's a lot of information, and it's certainly muddy and a mountain of information, but at the bottom of it all is the real discrimination here, or simply business judgments being exercised, and that's when you take a number of these facts together and look at what the company's goals were and you look at the fact that they were awarding things and you look at the fact that they're coaching her and you look at the fact that they're making her a manager, and even though it doesn't go to the Equal Pay Act claim, they're making her a manager and putting her in a position where, through her own efforts and otherwise, she's making $806,000 a year, and they're putting her in a position where she can make, if not $806,000 with some effort, but putting her in a position where she's a manager, number one, and would make a lot of money if you're going to discriminate against someone. Why would you make them a management? Why would you extend the coaching? Why would you put them in a position where they can make, you know, three-quarters or more of a million dollars on an annual basis? That doesn't sound like, to me, somebody's out to get somebody on a kind of prohibited basis. To me, that doesn't affect the Equal Pay Act claim. That's a distinct issue in my judgment. I'm just talking about the point that Judge Niemeyer raised about when all is said and done and the smoke clears, there's lots of smoke, and goodness knows you can go forward with circumstantial cases. I don't want to be misinterpreted as saying direct evidence is the only way to go, because it surely isn't. But I'm just wondering where the discrimination is. Yes, Your Honor, and if I may, I would like to address that point, because even if you believe that Ms. Bembridge can make a disputed issue effect as to her primary case, a disputed issue effect that she was meeting the company's expectations, I do not believe that she can make a pretext case. First, because she cannot show that the reasons proffered by tactile for removing her from the RSM position are false. But secondly, because there is nothing in this case that establishes pretext or that gives a suggestion of pretext. And I wanted to address the point that Semplewicz made with respect to the standard of pretext applied by the district court. The district court did not apply a heightened pretext standard. The district court quoted directly the standard from Laver v. Harvey that states that appellant may show that, or that the plaintiff may show pretext by showing that the articulated reason is false, but that they must show that there was discrimination, and in some cases they can show discrimination from the articulated reason's falsity, but this case is not like those cases where the court said there's something here. And first off, the criticisms tactile had are not shown to be false. Is there, as Judge Motz said, should we find that they're outweighed by these other things? I can't tell you, but they are not false. I believe that the court... Well, the employer replaced her with an employee who they had rated less than her. I mean, I just think that you can just give us one side of the story and maybe that's what you want to do and think is most effective, but that's not what we can do. We have to look at the whole record and all of the evidence. As my friend Judge Wilkinson said and Judge Niemeyer said, there's certainly a lot of it. And we're not saying, as I understand it, they haven't asked for summary judgment. I don't think they would be entitled to summary judgment, but the question is are there enough disputed facts here that you're not entitled to it either? And you just can't just look at your evidence and say that. They replaced her with somebody who they have rated less, but who is a man. There are two things that I'd like to say to that. First, in the prior performance evaluation where Mr. Sealing was rated lower, that was a year prior to the decision to replace her. And there's a lot of case law that says we're not going to take a performance evaluation from a year prior. I know, but they removed Maryland and Virginia from her region, which were the two most lucrative. I mean, there's a comeback to all these things, and you can just ignore them. But believe me, my colleagues and I hope I will look at the whole record. And so your argument has to be even this, this, and this, and this, and this that they put on. And you don't do that. All you do is talk about your evidence. So, Your Honor, I'm happy to talk about their evidence. I think there's a lot of smoke here, but there's really not a nut of fire. She talks about being Greg Sealing gulfing with Brian Reisch. But, in fact, there's evidence that Ms. Semplewich was also asked to gulf with Brian Reisch. She talks about exclusion from certain meetings, but it's a very high-level, general argument that she was not in a meeting. There were many different meetings that took place with many different people. There is not kind of a nut that says, other than her invitation to the court to speculate, that this is based on sex. There's not a nut there. And if all that it takes to get to trial is to say, I can say that they went gulfing, and I can say that they were friends, Semplewich knows that that's not all the evidence. If you want to ignore the strongest evidence, okay. What about they stated that they fired her in part because of her low hiring and high turnover, and then they listed people development and team building as her exceptional strengths in her performance evaluation. You know, so I'm not going to go through each piece of evidence, but what I think you have to do is to look at the mixed record here. And a lot of it is just my colleagues. And there is a lot of record. I acknowledge there's a lot of record. I think critically, Ms. Semplewich's admission to 2017 that she was not able to build her team, that she had empty headcount, that she was not able to fill the slots in the D.C. Territory and underneath Thermony Desai, who she was supposed to be developing, and that she admittedly, in a conversation that she recorded, and that she didn't tell Mr. Reach she was reporting, she said to Mr. Reach, what I'm struggling with is that I couldn't grow the way that you wanted me to. She then argued that there were factors that were outside of her control. And I don't expect her to agree. And in fact, the fact that she can point to disagreement is not surprising. This court in Hawkins v. PepsiCo said that that is not a surprise, that that does not create an issue of pretext. This court has also addressed that issue in Jones v. Lowe's, where they talk about Jones not being able to get to trial, which was very aware of the criticisms of her performance. And her dispute, her quibble, her belief that the good of her performance should outweigh the issues that were raised by tactile are simply not sufficient to get to trial. All right. Thank you very much. If there's some further questions, we'd be happy to hear from anybody. And Ms. Abernathy, you have some time for rebuttal. Thank you, Your Honor. I just want to address two overarching points that got discussed very quickly. The first is, I do want to emphasize, we are not asking this court to decide any issues in this case in our favor. In other words, she said, my client wins. All we are asking this court to do is to take this, as I've heard it described, very muddy record and send it back for a jury trial for a finder of facts to draw from the various evidence presented by the parties what inferences they believe are reasonable in this case. I understand that as judges and as people who are very involved in what you're looking at, what you're doing, it is very tempting to start trying to draw some of those inferences from your own experience, background, and beliefs. But that is ultimately a jury function. And all we are asking this court to do is for the jury to do that function. Ms. Abernathy, one of the things you talk about is all of these things go to the jury. But, you know, there is there are decisions like cell text which indicate that the plaintiff bears the burden of creating an issue of triable fact. And the summary judgment standard does have two limiting words to it which are genuine and material. And the Supreme Court has told us to look at the record as a whole, not just that the proof scheme which emphasizes prima facie case and pretext and the like, that's primarily a proof scheme for district courts. But the Court of Appeals has to take a holistic view of the record. And as to getting to trial, plaintiff bears the burden not only of the ultimate question of discrimination, but also you have to create an issue of triable fact. Now, you know, you think you have. The other side thinks you haven't. But just the fact that what concerns me is just the fact of disagreement about a particular decision that's made in a shop or just the fact of disagreement about something or the place that somebody is assigned or whether they were treated fairly or whatever. In every workplace in the country, there's going to be disagreement over things that happen within a business. But it is not, you have to go from disagreement to discrimination. And that's the step that is most difficult to take. And there are a number of undisputed facts here that argue against discrimination. They don't argue against disagreement, but they do argue against discrimination. And that's the problem. And you bear the burden of creating an issue of triable fact. And, Your Honor, I will reassure you that there have been a number of facts here discussed that are not necessarily ones that are helpful to my client's case. One that I want to point out in particular is looking at, for example, what happens to other women in the company. So, for example, looking at what happens to Ms. Gorham or looking at what happens to Ms. Dupree, the U.S. Supreme Court has been very emphatic over a number of decisions that that is not an appropriate place to look for evidence, that it is not relevant what Tactile did or did not do with other women at the company. Let's look at this individual, at the individual plaintiff. If you're out to discriminate against somebody, why wouldn't you just dismiss them? Or why would you put them in a position of earning three quarters of a million dollars a year and when the goals were not met there was repeated coaching to try to help the individual involved meet those goals? And why would you put the individual involved as a regional sales manager? I mean, all these things raise a question of the, I'm sure there were decisions with which the plaintiff was dissatisfied. But, you know, there are things about your job and my job and the judge's job and everything, there are a lot of things that I'm dissatisfied about. But I can't, I just I don't think it all translates into discrimination. Because the work environment, it doesn't, the decisions don't please everybody, which they did. Your Honor, I do want to address briefly your, and I know Tactile has argued this or characterized the record. You have on several occasions mentioned that my client received coaching. I would point to you JA 2070, which is Brian Reich's deposition admission that he couldn't remember there being any coaching. And the documents that Tactile has put up, you know, I would encourage your clerks to take a close look at those JA sites from Tactile's brief when they, you know, when they give their screen citations where they say there was a history of coaching. You won't find the words coaching in there. In fact, you won't even find any direct criticisms of my client's performance in those documents. So I just, we strongly dispute that characterization or that inference that my client received some form of coaching. And the evidence does not support that. I would also note that What was it that she did receive? What she received was an email from Brian Reich dated August 2, 2017 that she had actually asked him to send the day before and we provided that email to the court as well that was addressed to the two sales recruitment managers at Tactile asking them to help source candidates for her to interview. And there is, what Tactile cited is they cited that document and they cited some other testimony surrounding it. But what Tactile is doing there is they are drawing an inference from a document that is not plain on its face that does not plainly show any coaching of any sort on its face. They have drawn an inference from that and are pursuing that inference. And I would just point out that part of the summary judgment standard is that this court is required to draw all reasonable inferences in favor of the non-movers. No, we go back and forth on that, but the plaintiff is also required to have genuineness and materiality and there are things that each side can argue about. In the end it comes down to something of a judgment call really as to whether something is triable or subject to judgment as a matter of law. But Ms. Abernathy, I want to say how much we appreciate your being here and I hope, can you give us just a minute of summation or something so I can give you the final word here? Absolutely, Your Honor. And so we would respectfully request that this court reverse the decision of the district court and remand this case for trial on the merits before a jury where the parties can argue all of the various evidence and inferences that you've heard today and a jury can sort it out and determine what the final facts are. And that's the sole relief we're asking for here. Thank you, Your Honor. Judge Niemeyer, Judge Moss, do you have any further questions? No, thank you. I want to thank all three of you for a very fine argument. You represented your clients in positions very well and I wish we could come down and greet you and shake hands and thank you personally for the fine job you've done, but I hope you'll I hope you'll always take a degree of satisfaction from the very high quality of the argument we received. Thank you so much.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Diana Gribbon Motz